527 A.2d 787

**Melvin SHEETZ**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**No. 1443, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

July 9, 1987.

Certiorari Granted Dec. 10, 1987.

Carol L. Rubin, Pikesville, and Jack B. Rubin (Walker, Rubin and Van Bavel, P.A., on brief), Baltimore, for appellant.

John S. Wood, Chief Sol. (Benjamin L. Brown, City Sol. and Laurice D. Royal, Asst. Sol., on brief), Baltimore, for appellee.

Argued before BISHOP and POLLITT, JJ., and GETTY (JAMES S.), Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

BISHOP, Judge.

This case presents one issue of first impression in Maryland: whether the fourth amendment exclusionary rule, usually applicable in criminal cases, applies to civil administrative disciplinary proceedings involving the alleged misconduct of Baltimore City Jail correctional officers. In resolving this issue, our methodology is grounded in the pragmatism of cost-benefit analysis. Specifically, we must balance the social benefits in excluding illegally obtained evidence against the societal costs for such exclusion. Because of the especially important public interests in ensuring the safe and efficient operation of our prisons, we decline to extend the exclusionary rule to the administrative proceeding involved in this case.

## I.

### FACTS

On the evening of November 3, 1983, members of the Baltimore City Police Department had under surveillance a red van of Baltimore City Correctional Officer Lieutenant Clifford Weems, which he had parked across the street from the City Jail. Noticing the trafficking of people to and from the van around 10:15 p.m., the police moved in and arrested Lieutenant Weems, appellant and four other Baltimore City correctional officers, all of whom were inside the vehicle. In a warrantless search incident to the arrest, police seized packaged cocaine, heroin, marijuana and drug paraphernalia.

The State charged appellant with possession of cocaine, marijuana, drug paraphernalia and resisting arrest. The State's Attorney, however, dropped its prosecution of those charges when the District Court for Baltimore City suppressed all evidence amassed during the arrest on the ground that the search and seizure was in violation of appellant's fourth amendment rights.

Subsequently, a civil administrative proceeding was initiated in which the Warden of the Baltimore City Jail set out to discipline appellant. Relying on the illegally seized evidence, the Warden ruled that appellant Melvin Sheetz had conducted himself in a manner "unbecoming of an employee of the City," and was thus in violation of Baltimore City Civil Service Commission Rule 56(1)(f). Since the violation of this rule constitutes a "sufficient cause[ ] for removal or discharge," *id.*, the Warden terminated the employment of appellant as a correctional guard at the Baltimore City Jail.

Sheetz appealed the Warden's decision to the Civil Service Commission. A hearing officer for the Commission conducted a consolidated hearing involving appellant and several other similarly situated correctional officers. During that hearing, appellant argued that the district court's recent suppression order should apply to the Warden's disciplinary proceeding. The hearing officer denied appellant's request for suppression. The evidence was received over appellant's standing objection.

In a written opinion dated September 7, 1984, the hearing officer recommended that the Commission should sustain the Warden's decision to terminate appellant's employment. The Commission adopted the recommendation *in toto*.

Appellant then filed a petition for Writ of Mandamus [1] in the Circuit Court for Baltimore City against the Mayor and

1. Sheetz filed his mandamus action pursuant to Maryland Rule BE40, since he had exhausted his administrative remedies and no statute authorized an appeal to the circuit court. It is well established that judicial review by Writ of Mandamus is proper procedure when there is no statutory provision for hearing or review, and public officials

City Council of Baltimore, appellees. The circuit court, however, affirmed the decision, holding that the exclusionary rule is not applicable in a civil administrative disciplinary proceeding.

*The Scope of the Exclusionary Rule*

A.

*Criminal Cases*

The Fourth Amendment guarantees:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Based on this amendment, the Supreme Court has crafted the exclusionary rule as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974); *accord United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984) (quoting *Calandra*); *see also Whitaker v. Prince George's County,* 307 Md. 368, 381, 514 A.2d 4 (1986). In emphasizing that "the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures," the Court in *Calandra* pointed out:

"The rule is calculated to prevent not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."

---

are alleged to have abused their discretion. *State Department of Health v. Walker,* 238 Md. 512, 522–23, 209 A.2d 555 (1965). *See also Legg v. Annapolis,* 42 Md. 203, 226 (1875) (stating that mandamus is appropriate in all cases where the law has established no specific remedy and where in justice there ought to be one).

*Calandra,* 414 U.S. at 347, 94 S.Ct. at 620 (quoting *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).

The evolution of the rule began in 1914 when the Supreme Court ruled that federal courts must exclude evidence that a federal officer seized in violation of the Fourth Amendment. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). This rule, supervisory in nature, applied to federal, and not to state court proceedings. State officials could illegally seize material for trial without the threat of judicial sanction in state proceedings, except in the most extreme cases. *See, e.g., Wolf v. Colorado,* 328 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949) (determining that Fourth Amendment was applicable to states through the Fourteenth Amendment, but only to the extent of protecting against intrusions that "are implicit in the concept of ordered liberty"); *Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952) (ruling that an illegal seizure of evidence could be sufficiently offensive to the concept of "ordered liberty" as to render the admission of that evidence a violation of the due process clause).

*Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) expanded radically the scope of the exclusionary rule. Holding the rule applicable to state criminal proceedings, the Court explained:

> Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government. Were it otherwise, then just as without the *Weeks* rule the assurance against unreasonable federal searches and seizures would be "a form of words," valueless and undeserving of mention in a perpetual charter of inestimable human liberties, so too, without that rule the freedom from state invasions of privacy would be so ephemeral and so neatly severed from its conceptual nexus with the freedom from all

brutish means of coercing evidence as not to merit this Court's high regard as a freedom "implicit in the 'concept of ordered liberty.' "

*Id.* at 655, 81 S.Ct. at 1691.

The effect of *Mapp* was simply to prevent the use of illegally obtained evidence in the State's case-in-chief. The Court left unanswered the question of what other situations the exclusionary rule should apply. A review of decisions subsequent to *Mapp*, however, indicates that the Court has taken a conservative approach to expanding the scope of the rule in other criminal contexts. For example, the Court has declined to extend the rule to federal habeas corpus proceedings filed in a federal court by a state prisoner, *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), to grand jury proceedings, *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and has limited the rule in situations in which law enforcement officials have conducted a search and seizure in good faith reliance on a facially valid search warrant, which a court subsequently renders invalid. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *see also Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) (holding exclusionary rule not applicable when police conduct search in good faith reliance on a substantive criminal statute that subsequently is declared unconstitutional). In addition, the Court has recognized that evidence, which is inadmissible in the case-in-chief, may be used to impeach defendant's direct testimony. *United States v. Havens*, 446 U.S. 620, 627, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980). *See generally Leon*, 468 U.S. at 910–13, 104 S.Ct. at 3413–15 (discussing narrow scope of the exclusionary rule).

## B.

### Noncriminal Cases

In discussing the scope of the exclusionary rule, the Supreme Court has admonished:

Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served. *Calandra*, 414 U.S. at 348, 94 S.Ct. at 620. Following this conservative approach, the Court has concluded that the rule's remedial objectives are not efficaciously served in several types of noncriminal proceedings. *See, e.g., I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (holding exclusionary rule is not applicable to deportation proceedings); *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (refusing to extend the exclusionary rule to federal civil tax proceedings where evidence was obtained illegally by State authorities).

The Court, however, had identified forfeiture proceedings as at least one type of noncriminal proceeding in which the exclusionary rule should apply. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). In that case, Pennsylvania police stopped and searched a car, finding in the trunk thirty-one cases of liquor not bearing Pennsylvania tax seals. Pursuant to statute, the State filed a petition for forfeiture of the automobile. At the hearing, the owner of the car sought dismissal on the ground that the forfeiture of the automobile depended upon the admission of evidence that police obtained in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. The Pennsylvania Supreme Court rejected this objection and held the exclusionary rule was inapplicable. The Supreme Court reversed.

Noting that the object of a forfeiture proceeding is "to penalize for the commission of an offense against the law," the Court characterized the proceeding as "quasi-criminal" in nature. *Plymouth Sedan*, 380 U.S. at 700, 85 S.Ct. at 1250. In reaching this conclusion, the Court focused on the substantial penalty which the forfeiture proceeding imposed

on the defendant: forfeiture of a car valued at approximately one thousand dollars. Given the fact the defendant could have received a less severe penalty, a fine that could not exceed five hundred dollars, for the criminal conviction for the same offense, the Court reasoned that, the exclusionary rule should apply:

> It would be anomalous indeed, under the circumstances, to hold that in the criminal proceeding the illegally seized evidence is excludable, while in the forfeiture proceeding, requiring the determination that the criminal law has been violated, the same evidence would be admissible.

*Id.* at 701, 85 S.Ct. at 1251.

The case *sub judice* involves an administrative disciplinary proceeding, and not a forefeiture proceeding. Appellant, nevertheless, contends *Plymouth Sedan* is controlling by analogy. In each case, the proof of a criminal violation in a noncriminal proceeding brings on the imposition of a related, but noncriminal, sanction. In *Plymouth Sedan,* proof that defendant illegally transported liquor in his car results in the forfeiture of the vehicle involved in that transportation. In the instant case, proof that appellant violated various narcotics laws results in the termination of his employment as a correctional officer.

There is a general similarity in the two proceedings. Like the forfeiture proceeding, the administrative proceeding does contain a punitive element. Depriving an individual of his employment is a penalty of serious magnitude. *See, e.g., Powell v. Zuckert,* 366 F.2d 634, 640 (D.C.Cir.1966) (noting that the Supreme Court, in considering proceedings to discharge a public employee, "has analogized to proceedings that 'involve the imposition of criminal sanctions' ") (quoting *Peters v. Hobby,* 349 U.S. 331, 344, 75 S.Ct. 790, 797, 99 L.Ed. 1129 (1955); citing *Greene v. McElroy,* 360 U.S. 474, 496–97, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)); *Board of Selectmen of Framingham v. Municipal Court of Boston,* 373 Mass. 783, 369 N.E.2d 1145, 1147 (1977) (indicating that disciplinary hearing is "not a purely civil proceeding by one private party against another"); *Govern-*

*ing Board of Mountain View School District v. Metcalf,* 36 Cal.App.3d 546, 551–52, 111 Cal.Rptr. 724 (1974) (recognizing that discharging a teacher "is punitive in character" and that such a "deprivation ... may be a much more severe punishment for a criminal offense than anything the criminal law imposes", but nonetheless refusing to apply the exclusionary rule because of the nature of the profession); *Rinderknecht v. Maricopa County Employees Merit System,* 21 Ariz.App. 419, 520 P.2d 332, 335 (Ariz.Ct.App.1974) (concluding that discharge "proceedings [against a deputy sheriff] have a sufficient quasi-criminal nature to warrant application of the exclusionary rule in order to protect Fourth Amendment rights" and therefore directing the application of the rule); *City of New Brunswick v. Speights,* 157 N.J.Super. 9, 384 A.2d 225, 231 (1978) (noting "that the loss of a police officer's position with a city is sufficiently severe and carries with it such penal and quasi-criminal overtones as may require" the imposition of the exclusionary rule). *See generally Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963) (discussing the tests traditionally applied to ascertain whether law is penal or regulatory in nature). Notwithstanding the existence of a punitive element inherent in employment discrimination proceedings, we do not find *Plymouth Sedan* controlling in the disposition of the case *sub judice.*

First, the object of the disciplinary proceeding was not purely to punish. Appellant was dismissed pursuant to Civil Service Commission Rule 56, which provides, in pertinent part:

> The following are recognized by the Commission as sufficient causes for removal or discharge of an employee from the Classified Civil Services, although charges may be based upon causes other than those enumerated.
>
> *    *    *    *    *    *
>
> (f) That the employee has committed acts while on and off duty which amount to conduct unbecoming to an employee of the city.

The Commission defines "removal for cause" as "the suspension for [sic] Classified Civil Service of those employees *interfering with the efficient discharge of the duties* of their position." Rule 1 S. (emphasis added) To challenge the decision to terminate, appellant must file with the Commission a request to investigate pursuant to Rule 57(1)(a), which provides in pertinent part:

> In case an employee is removed by an appointing officer, or by the Commission, and such employee has reason to believe that his removal is *for reasons other than the good of the service,* or for or on account of his political or religious opinions or affiliations, or for refusal to contribute to any political fund, or refusing to render any political services, said employee shall file with the Commission within five days after the receipt of his order of removal, a request in writing that the Commission investigate his removal, and said written request shall contain an answer to his notice of removal and shall contain a statement that he believes that his removal was *for reasons other than the good of the service,* or for or on account of his political or religious opinions or affilitations, or for refusing to contribute to any political fund, or refusing to render any political services.

(emphasis added). Conspicuously absent from the Civil Service Commission Rules is any reference that would suggest the object of the proceeding is to impose sanctions or to punish employees. Rather, the Rules speak in terms of promoting the "efficient discharge of the duties" and the "good of the service." Rule 1 S and 57(1)(a). *See also* Charter of Baltimore City § 118(a) (forbidding the removal of employees except for "those ... [causes which] may interfere with the efficient discharge of the duties of the position").

The absence of punitive language cannot change the realities of the situation. Especially in light of the case law already described, the discharge of appellant for conduct unbecoming a city employee operates as a punishment of appellant and may deter other employees from engaging in

similar misconduct. The presence of language requiring city officials and the Commission to base an employee's dismissal solely in terms of "the good of the service" and "efficient discharge of duties", however, does suggest that the object of the disciplinary proceeding was not solely punitive. Rather, these explicitly stated positive goals indicate that a significant, if not principal, purpose of the proceeding was to promote an efficient civil service work force. Because the proceeding in the case *sub judice* is clearly distinguishable from the purely punitive proceeding of *Plymouth Sedan*, we hold that this precedent does not require this Court to apply the exclusionary rule in this case.

Second, the Court of Appeals has been parsimonious in its disposition to extend the exclusionary rule beyond the forfeiture proceedings of *Plymouth Sedan* to other kinds of noncriminal proceedings. The Court recently decided that the exclusionary rule should apply neither to revocation of probation proceedings, *Chase v. State*, 309 Md. 224, 522 A.2d 1348 (1987), nor to a public nuisance action to enjoin the operation of a bawdyhouse. *Whitaker v. Prince George's County*, 307 Md. 368, 514 A.2d 4 (1986). In both cases, the Court narrowly construed *Plymouth Sedan*, distinguishing the proceedings at issue in the cases before it from forfeiture proceedings. In *Chase*, the Court pointed out that revocation of probation lacks the punitive element inherent in forfeiture proceedings:

> In our revocation of probation proceedings the revocation is "not a penalty for the criminal offense," even though the new criminal offense may be the basis for the revocation.... The revocation is a civil action to determine whether the probationer is to remain on probation, not to punish his conduct for which probation may be revoked.

*Chase*, 309 Md. at 247, 522 A.2d 1348 (citation omitted). Similarly, the Court in *Whitaker* distinguished *Plymouth Sedan* by emphasizing that a public nuisance action is not

a criminal proceeding and in no sense is the action vindictive or punitive. Rather, the proceedings only seek determination of whether appellants engaged in prostitution-related activities and, if so, whether those activities should be enjoined, and whether those activities were violative of certain court orders.[2]

*Whitaker*, 307 Md. at 383, 514 A.2d 4.

We recognize that the administrative disciplinary proceeding now before us is neither the revocation of probation proceeding of *Chase* nor the public nuisance-contempt action of *Whitaker*. The Court's refusal, however, to extend the exclusionary rule beyond proceedings, the object of which is purely punitive, is a strong indication that the rule should not be applied here.

## II.

### *Intrasovereign Relationship*

The record before us indicates that an unusually close intrasovereign relationship exists between the agency that illegally seized the incriminating evidence, i.e. the Baltimore City Police Department, and the agency that sought to use that evidence, i.e. the Baltimore City Jail. The arrests of appellant and his fellow correctional officers were the culmination of an ongoing police investigation into rumors that Lieutenant Weems at the City Jail was involved in the use and sale of narcotics. Police became aware of these rumors when the Warden contacted Captain Newman of the police department about unconfirmed reports regarding Lieutenant Weems' drug involvement. The Warden conducted an initial cursory investigation into the matter, but no longer pursued it once the police assumed the investigation. The

---

2. The Court reached the above conclusion in spite of the fact that eight of the defendants in one of the two consolidated cases decided in *Whitaker* were required to post substantial bonds guaranteeing they would comply with the court order. In the other, the defendant was given a six month suspended sentence and required to pay a $6,000.00 fine to purge the contempt.

police kept the Warden currently informed as the investigation progressed and supplied him with detailed incriminating evidence once the police arrested the six correctional officers on November 3, 1983.

Moreover, the record reveals a cooperative relationship between the Warden and the State's Attorney's Office of Baltimore City after the completion of the investigation. Specifically, the Warden sought the advice of the State's Attorney in deciding whether he should conduct an administrative disciplinary hearing. In a letter dated December 7, 1983, the State's Attorney, Mr. Schmoke, encouraged the Warden to pursue such proceedings:

> My understanding from you is that you intend to pursue administrative proceedings against some of these officers. I applaud that decision.... Since the court's ruling has no impact on administrative hearings, I urge you to pursue the administrative charges against these men.

Based on this evidence establishing a close intrasovereign relationship, appellant argues that *United States v. Janis*, 428 U.S. 433, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) requires this Court to apply the exclusionary rule in the case *sub judice*. In *Janis*, the relationship between the agency seizing the evidence and the agency attempting to benefit from that evidence was *inter*sovereign. According to the facts of that case, Los Angeles police seized $4,940.00 in cash and gambling paraphernalia from Janis pursuant to an invalid search warrant. *Janis*, 428 U.S. at 436–38, 96 S.Ct. at 3023–24. Although the Fourth Amendment prohibited the State and the Federal Government from using the evidence in criminal trials, *id.* at 458, 96 S.Ct. at 3034, the Internal Revenue Service (IRS) brought a civil action in federal court for unpaid taxes from Janis' undeclared income.[3] The Federal Government based its claim on the

---

**3.** The procedural posture surrounding the Federal Government suit in *Janis* was more complicated. The IRS calculated Janis' unpaid taxes as $89,206.09 plus interest. In partial satisfaction of that assessment,

gambling records and other evidence that local police illegally seized. *Id.* at 437, 96 S.Ct. at 3024.

The district and circuit courts held in favor of Janis on the ground that "substantially all, if not all, of the evidence utilized by the defendants herein in making their assessment ... was illegally obtained." *Id.* at 439, 96 S.Ct. at 3025. The Supreme Court, however, reversed and held "that the judicially created exclusionary rule should not be extended to forbid the use in the civil proceeding of one sovereign of evidence seized by a criminal law enforcement of another sovereign." *Id.* at 459–60, 96 S.Ct. at 3034–35. In reaching this conclusion, the Court explained that the deterrent function of the rule would not be served in intersovereign situations:

> Working, as we must, with the absence of convincing empirical data, common sense dictates that the deterrent effect of the exclusion of relevant evidence is highly attenuated when the "punishment" imposed upon the offending criminal enforcement officer is the removal of that evidence *from a civil suit by or against a different sovereign.* In *Elkins* the Court indicated that the assumed interest of criminal law enforcement officers in the criminal proceedings of another sovereign counterbalanced this attenuation sufficiently to justify an exclusionary rule. Here, however, the attenuation is further augmented by the fact that the *proceeding is one to enforce only the civil law of the other sovereign.*
>
> This attenuation, coupled with the existing deterrence effected by the denial of use of the evidence by either sovereign in the criminal trials with which the searching officer is concerned, creates a situation in which the imposition of the exclusionary rule sought in this case is

---

the IRS levied on the cash of $4,940.00 which the police had seized. After the State court had ruled that the search and seizure violated the Fourth Amendment, Janis sued the federal court for that amount. The federal government then counterclaimed for the unpaid balance based on the illegally seized evidence. *Janis,* 428 U.S. at 437–38, 96 S.Ct. at 3024.

unlikely to provide significant, much less substantial, additional deterrence. It falls outside the offending officer's zone of primary interest. The extension of the exclusionary rule, in our view, would be an unjustifiably drastic action by the courts in the pursuit of what is an undesired and undesirable supervisory role over police officers. See *Rizzo v. Goode*, 423 U.S. 362 [96 S.Ct. 598, 46 L.Ed.2d 561] (1976).

*Id.* at 457–58, 96 S.Ct. at 3034 (footnote omitted) (emphasis added).

In a footnote, the Court continued that if Janis had proved federal participation or involvement in the illegal search and seizure by State officials, the outcome may have been otherwise:

As stated above in n. 3, we decide the present case on the assumption that no such agreement or arrangement existed. Respondent remains free on remand to attempt to prove that there was federal participation in fact. If he suceeds in that proof, he raises the question, not presented by this case, whether the exclusionary rule is to be applied in a civil proceeding involving an *intrasovereign* violation.

*Id.* at 455–56 n. 31, 96 S.Ct. at 3033 (emphasis added). Seizing upon the Court's language in the footnote, appellant argues that *Janis* requires the application of the exclusionary rule in civil proceedings involving intrasovereign relationships. Just as the Court in *Mapp v. Ohio*, 367 U.S. 643, 658, 81 S.Ct. 1684, 1693, 6 L.Ed.2d 1081 (1961) forbade federal officers from "step[ing] across the street to the State's Attorney with their unconstitutionally seized evidence," appellant argues so too did the Court in *Janis* forbid local police from stepping across the street to the Warden with illegally obtained evidence.

We think that appellant misconstrues the significance of the *Janis* footnote. It is true that the Court limited its holding to intersovereign situations, concluding that

common sense dictates that the deterrent effect of the exclusion of relevant evidence is highly attenuated when

the "punishment" imposed upon the offending criminal enforcement officer is the removal of that evidence from a civil suit by or against a different sovereign.

*Janis,* 428 U.S. at 457–58, 96 S.Ct. at 3034. Nowhere in the footnote or elsewhere in the opinion, however, does the Court suggest that the exclusionary rule would be appropriate in intrasovereign situations such as the one *sub judice.* Rather, the Court hinted that the outcome could be different once the deterrent effect has been weighed against the competing interests. Since that issue was "not presented by this [*Janis* ] case," the Court declined to address it. *Id.* at 455–56 n. 31, 96 S.Ct. at 3033.

Unlike *Janis,* the parties here present the issue of whether the exclusionary rule applies in the situation involving a close intrasovereign relationship between the offending police department and the City Jail. To assess the impact that this intrasovereign relationship has on the outcome of the case, we must follow the guidelines of *Janis* and balance the social benefits realized in excluding illegally obtained evidence against the societal costs which must be paid for such exclusion. *Janis,* 428 U.S. at 453–54, 96 S.Ct. at 3031–32. *Calandra,* 414 U.S. at 347, 94 S.Ct. at 619. *See also Whitaker,* 207 Md. at 381, 514 A.2d 4.

On the benefit side, the chief purpose "of the rule, if not the sole one 'is to deter future unlawful police conduct.' " *Janis,* 428 U.S. at 446, 96 S.Ct. at 3028 (quoting *Calandra,* 414 U.S. at 347, 94 S.Ct. at 619). Thus, an important factor in assessing the applicability of the rule is the extent to which exclusion deters, or nonexclusion encourages, illegal searches and seizures. On the cost side, we consider the loss of relevant and reliable evidence and "all of the secondary costs that flow from less accurate or more cumbersome adjudication that therefore occurs." *I.N.S. v. Lopez-Mendoza,* 468 U.S. 1032, 1041, 104 S.Ct. 3479, 3485, 82 L.Ed.2d 778 (1984).

In the case before us the costs of applying the rule clearly exceed any added deterrence that the rule's application would bring. In addition to losing probative evidence

regarding appellant's misconduct, application of the rule would adversely affect the future operation of the city jail. Clearly, correctional officers' involvement with illegal drugs undermines their ability to function efficiently at the jail and jeopardizes the safety of the prisoners, other prison guards, and the public in general.

It is one thing to acquit an individual who has committed a criminal act in the past, but quite another to fail to protect the public from future wrongdoing. In such instances, courts have recognized the inappropriateness of applying the exclusionary rule in such situations as when: the State seeks to revoke the license of a doctor or nurse who has recklessly killed a patient, *cf. Pierce v. Board of Nursing Education and Nurse Registration,* 255 Cal. App.2d 463, 466, 63 Cal.Rptr. 107 (Cal.Ct.App.1967) (stating that "[w]e do not wish to intimate a belief that these rules apply in administrative proceedings, especially in one involving fitness of a person to be licensed in a healing art where the welfare of sick and helpless persons depends on his integrity, fidelity, or skill"), the disbarment of an unscrupulous lawyer, *People v. Harfmann,* 638 P.2d 745, 747 (Colo. 1981) (holding that exclusionary rule may not shield a lawyer in disciplinary proceedings since "the court's primary duty is to protect the public and legal profession from unscrupulous lawyers"), and the dismissal of a public school teacher who had been convicted of an immoral crime. *Governing Board of Mountain View School District v. Metcalf,* 36 Cal.App.3d 546, 551, 111 Cal.Rptr. 724 (1974) (noting that "primary purpose of the [disciplinary] proceeding . . . is to protect Metcalf's pupils and other school children" and thus holding exclusionary rule inapplicable). In each of these cases, the important objective of the proceeding, which in general terms was to deprive the offender of a special opportunity to do further harm, outweighed the deterrence effect of applying the rule.

On occasions when the Supreme Court has considered costs of this type, it also has indicated that the exclusionary rule should not apply. For example, the situation in *Lopez-*

*Mendoza* involved the application of the rule to deportation proceedings. In holding that the rule is not applicable, the Court explained:

> Sandoval-Sanchez is a person whose unregistered presence in this country, without more, constitutes a crime. His release within our borders would immediately subject him to criminal penalties. His release would clearly frustrate the express public policy against the alien's unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such a result. *The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime.* When the crime in question involves unlawful presence in this country, the criminal may go free, but he should not go free within our borders.

*Lopez-Mendoza,* 468 U.S. at 1047, 104 S.Ct. at 3488 (footnotes omitted) (emphasis added). *See also, United States v. Jeffers,* 342 U.S. 48, 54, 72 S.Ct. 93, 96, 96 L.Ed. 59 (1951) (rule not applicable to illegal narcotics seized); *Trupiano v. United States,* 334 U.S. 699, 710, 68 S.Ct. 1229, 1234, 92 L.Ed. 1663 (1948) (rule not applicable to illegal contraband, an unregistered still, alcohol and mash). Because this disciplinary proceeding involves the important interest of ensuring the efficient operation of the City Jail, we decline to apply the exclusionary rule.[4] In reaching this result, we

---

4. The issue of whether appellant had the right to invoke the exclusionary rule was not raised below. In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court narrowed the situations in which a defendant has standing to exclude fruits of an illegal search and seizure. The Court held that the rule of standing to raise vicarious Fourth Amendment claims should not be extended by a so-called "target theory" whereby any criminal defendant at whom a search was "directed" would have standing to contest the legality of that search and object to the admission at trial of evidence obtained as a result of that search. 439 U.S. at 135–38, 99 S.Ct. at 426–27. In the case *sub judice,* Baltimore City Police seized illegal drugs and drug paraphernalia pursuant to a police investigation in which the police had targeted as suspects Lieutenant Weems and possibly other correc-

express no opinion as to the rule's applicability to administrative proceedings generally in which such important public interests are not involved.

JUDGMENT AFFIRMED;

COSTS TO BE PAID BY APPELLANT.

tional officers of the Baltimore City Jail. On December 5, 1983, the District Court for Baltimore City granted appellant's motion to suppress that evidence on grounds that the search and seizure violated the Fourth Amendment. Based on our review of the content of the record before us, it is impossible to determine the precise grounds upon which the court based its ruling. If the Court had granted the motion to suppress exclusively on the grounds of an illegal search of Leiutenant Weems' van, then appellant would lack standing. If, on the other hand, the court granted the motion on grounds of an illegal search of appellant or that for some reason appellant possessed an expectation of privacy when the police searched the van, then appellant would have standing.